Slip Op. 17-136

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| UNITED STATES,<br><br>              Plaintiff,<br><br>       v.<br><br>INTERNATIONAL FIDELITY INSURANCE<br>COMPANY,<br><br>              Defendant. | Before: Leo M. Gordon, Judge<br><br>Court No. 13-00256 |

**OPINION**

[Defendant's motion for summary judgment denied; Plaintiff's cross-motion for summary judgment granted, except with respect to its claim for equitable pre-judgment interest, which is denied.]

Dated: October 5, 2017

<u>Monica P. Triana</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of New York, NY, for Plaintiff United States. With her on the brief were <u>Chad A. Readler</u>, Acting Assistant Attorney General, and <u>Amy M. Rubin</u>, Assistant Director. Of counsel on the brief was <u>Chi S. Choy</u>, Attorney, Office of the Assistant Chief Counsel for International Trade Litigation, U.S. Customs and Border Protection of New York, NY.

<u>Ralph H. Sheppard</u>, <u>Taylor Pillsbury</u>, and <u>Michael B. Jackson</u>, Meeks, Sheppard, Leo & Pillsbury of Fairfield, CT, for Defendant International Fidelity Insurance Company.

Gordon, Judge: This is a collection action by Plaintiff United States ("Plaintiff" or

"Government") against Defendant International Fidelity Insurance Company ("Defendant

or "Fidelity") as surety for unpaid antidumping duties,[1] plus statutory pre-judgment interest

under 19 U.S.C. § 580, equitable pre-judgment interest, and post-judgment interest.

---

[1] The amount of unpaid antidumping duties is $288,860.69; however, Plaintiff is seeking only $231,000, the face amount of the bond.

Before the court are the parties' USCIT Rule 56 cross-motions for summary judgment. See Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. and Supp. Pl.'s Cross-Mot. Summ. J., ECF No. 32 ("Pl.'s Br."); Def.'s Mem. Supp. Mot. Summ. J., ECF No. 24-1 ("Def.'s Br."); Pl.'s Reply to Def.'s Resp. and Supp. Pl.'s Cross-Mot. Summ. J., ECF No. 53 ("Pl.'s Reply"); Def.'s Reply Mem. and Opp'n Pl.'s Cross-Mot. Summ. J., ECF No. 46 ("Def.'s Reply").

Defendant contends that (1) the Government's claims are time-barred; (2) the bond on which those claims are based, Customs Bond No. 017447—a single transaction bond in the amount of $231,000 ("subject bond")—is invalid and unenforceable; and (3) even if the subject bond is valid, the Government is not entitled to statutory or equitable pre-judgment interest or post-judgment interest.[2] Conversely, Plaintiff maintains that (1) its claims are timely; (2) the subject bond is valid and enforceable; and (3) the Government is entitled to statutory and equitable pre-judgment interest and post-judgment interest. The court has jurisdiction pursuant to 28 U.S.C. § 1582(2) (2012). For the reasons that follow, the court denies Defendant's motion for summary judgment and grants Plaintiff's cross-motion, except with respect to Plaintiff's claim for equitable pre-judgment interest, which is denied.

---

[2] There is no dispute that the copies of the bond filed with the court as Exhibit 2 to the Defendant's Brief and as Exhibit A to the Diffley Declaration submitted by Plaintiff represent the subject bond that was filed with and approved by Customs. See Def.'s Br., Ex. 2; see also Diffley Decl. ¶ 4 & Ex. A, ECF Nos. 32-2, 36-4.

## I.  Standard of Review

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." USCIT R. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). "When both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." JVC Co. of Am. v. United States, 234 F.3d 1348, 1351 (Fed. Cir. 2000). Because the dispositive issues are solely legal and the material facts are uncontroverted, summary judgment is appropriate. See 10A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus & Adam N. Steinman, Federal Practice & Procedure § 2725 (4th ed. 2017); see also Dal–Tile Corp. v. United States, 24 CIT 939, 944, 116 F. Supp. 2d 1309, 1314 (2000) (citing Marathon Oil Co. v. United States, 24 CIT 211, 214, 93 F. Supp. 2d 1277, 1279–80 (2000)).

## II.  Background

On May 1, 2002, U.S. China Leader Express Co. ("China Leader"), a U.S. importer, imported fresh garlic from the People's Republic of China ("PRC") at the Port of New York/Newark under entry number 267-4221127-4 ("subject entry"). See Diffley Decl., ECF No. 32-2 (public version) & 36-4 (confidential exhibits). The underlying merchandise was exported by Huaiyang Hongda Dehydrated Vegetable Company ("Hongda"), a producer and exporter of garlic from the PRC, see Diffley Decl., Ex. A, ECF No. 36-4 (entry paperwork), and subject to a PRC-wide antidumping duty margin of 376.67%,

see Fresh Garlic from the PRC, 59 Fed. Reg. 59,209 (Dep't of Commerce Nov. 16, 1994) (antidumping duty order). At the time of entry, China Leader submitted the subject bond as security for the estimated antidumping duties, in lieu of a cash deposit. See Def.'s Br., Ex. 2, ECF No. 24-2.

The subject bond identified China Leader as the principal on that bond, Fidelity as the surety, and Mid-America Overseas, Inc. ("Mid-America") as the customs broker. See Def.'s Br., Ex. 2. International Bond & Marine Brokerage, Ltd. ("IB&M") was Fidelity's third-party agent at the time of the execution of the subject bond. See Def.'s Statement of Material Facts as to which There is No Genuine Issue to be Tried ¶ 2, ECF No. 24-4 ("Def.'s Statement").

In December 2002, the U.S. Department of Commerce ("Commerce") initiated a periodic administrative review under 19 U.S.C. § 1675 covering Hongda's shipments of garlic for the period May 1, 2002 through October 31, 2002 ("POR"). Initiation of Antidumping and Countervailing Duty Admin. Revs., 67 Fed. Reg. 78,772 (Dep't of Commerce Dec. 26, 2002). In August 2003, Commerce rescinded the administrative review with respect to Hongda, thereby subjecting Hongda's garlic shipments to the PRC-wide antidumping duty rate. See Fresh Garlic from the PRC, 68 Fed. Reg. 46,580 (Dep't of Commerce Aug. 6, 2003) (notice of rescission).

In September 2003, Hongda challenged Commerce's rescission decision and the application of the PRC-wide antidumping duty rate to its garlic shipments by commencing

an action in this Court. See Huaiyang Hongda Dehydrated Vegetable Co. v. United States, 28 CIT 1944 (2004) ("Huaiyang Hongda"). In the course of that action, Hongda obtained a statutory injunction enjoining liquidation of subject merchandise exported by Hongda and entered during the POR, including the subject entry. See id., ECF No. 18 (order enjoining liquidation of entries). Subsequently, Commerce notified U.S. Customs and Border Protection ("Customs") of the injunction, instructing Customs not to liquidate entries of the subject merchandise exported by Hongda during the POR. See Pl.'s Br., Ex. E (Commerce Message No. 3316202 to Customs (Nov. 12, 2003)).

In November 2004, at the conclusion of the litigation, the court sustained Commerce's rescission decision. See Huaiyang Hongda. Subsequently, a copy of the court's decision was published in the Customs Bulletin and Decisions ("Customs Bulletin"). Def.'s Statement ¶ 11 (citing 38 Cust. B. & Dec. 50 (Dec. 8, 2004)). Thereafter, on January 21, 2005, the 60-day period for appeal expired, with no party filing an appeal.

Two years later, on January 24, 2007, Commerce sent an electronic message to Customs  notifying Customs of the dissolution of the injunction in Huaiyang Hongda and directing Customs to liquidate the entries whose liquidation was previously suspended. See Pl.'s Br., Ex. F (Commerce Message No. 7024202 to Customs (Jan. 24, 2007)) ("Liquidation Instructions"). On September 21, 2007, approximately nine months after Commerce issued its Liquidation Instructions, Customs liquidated the subject entry at the PRC-wide antidumping duty rate of 376.67%. Def.'s Statement ¶ 13.

Thereafter, Customs sought to collect the outstanding antidumping duties from China Leader but was unsuccessful. See Compl. ¶ 14; Def.'s Br., Ex. 6 (Customs letter to Fidelity dated Apr. 21, 2008 regarding delinquent Bill Number 44899663). Customs then demanded payment from Fidelity by letters dated April 21, 2008, and May 1, 2013. See Def.'s Br., Ex. 6; Pl.'s Br., Ex. G, ECF No. 36-2.

On July 25, 2008 and December 30, 2010, Fidelity filed protests regarding each of Customs' demand letters, denying liability on the subject bond. See Pl.'s Br., Ex. H, ECF No. 36-3. On September 18, 2009, Customs denied Fidelity's 2008 protest in part, explaining that liquidation had occurred by operation of law at the rate declared by the importer at the time of entry up to $231,000, the face value of the subject bond. See Def.'s Br., Ex. 1, ECF No. 24-4. According to Fidelity, Customs had not issued a decision as to the 2010 protest as of the time it filed its summary judgment motion. See Def.'s Statement ¶ 20.

Subsequently, on July 23, 2013, the Government commenced this action seeking the unpaid antidumping duties, capped by the face amount of the subject bond, plus pre- and post-judgment interest. See Compl., ECF No. 2.

### III.  Discussion
### A.  Statute of Limitations

Under 28 U.S.C. § 2415(a), the Government may bring a collection action on a bond contract within six years of the date on which the Government's right of action

accrues. In a collection action on a customs bond, "[t]he Government's right of action accrues from the date of liquidation." United States v. Great Am. Ins. Co., 35 CIT ___, ___, 791 F. Supp. 2d 1337, 1350 (2011).

Where, as here, liquidation of an entry was suspended by court order, Customs "shall liquidate the entry . . . within 6 months after receiving notice of the removal [of the suspension] from [Commerce], other agency, or a court with jurisdiction over the entry." 19 U.S.C. § 1504(d). If Customs fails to liquidate the entries within six months of receiving notice of the removal of the suspension of liquidation, liquidation is deemed to have occurred by operation of law. 19 U.S.C. § 1504(d); see also Fujitsu Gen. Am., Inc. v. United States, 283 F.3d 1364, 1376 (Fed. Cir. 2002) ("[I]n order for a deemed liquidation to occur, (1) the suspension of liquidation that was in place must have been removed; (2) Customs must have received notice of the removal of the suspension; and (3) Customs must not liquidate the entry at issue within six months of receiving such notice.").

When liquidation occurs by operation of law, the six-year statute of limitations commences on the date of the deemed liquidation. See United States v. Am. Home Assurance Co., 40 CIT ___, ___, 151 F. Supp. 3d 1328, 1343 (2016) (holding that Government's cause of action on certain bonds was time-barred because it "failed to bring its collection actions within six years of the dates the [bonded] entries were deemed liquidated") ("Am. Home Assurance I"). "Because section 1504 provides that an entry will be deemed liquidated by operation of law if Customs does not liquidate the entry within

six months of receiving notice from Commerce that the suspension has been removed, it is critical to determine [1] what constitutes the act that effects the removal of suspension and [2] what constitutes notice of the removal to Customs." Int'l Trading Co. v. United States, 281 F.3d 1268, 1271 (Fed. Cir. 2002).

In cases where liquidation is suspended by a court-ordered statutory injunction, the removal of the suspension occurs when the court renders its "final" decision in the matter, and the time to appeal that decision has expired. See Fujitsu Gen., 283 F.3d at 1378-79. The "notice" required under § 1504(d) must provide a sufficiently "unambiguous and public starting point for the six-month liquidation period . . . ." Id. at 1381; see also Int'l. Trading Co., 281 F.3d at 1275. "[S]pecific liquidation instructions from Commerce via email or mailed notice, and publishing notice of a decision in the Federal Register are adequate forms of 'notice' under Section 1504(d)." Travelers Indem. Co. v. United States, 32 CIT 1057, 1061, 580 F. Supp. 2d 1330, 1334 (2008) (citations omitted). "These methods of notice are acceptable, but they are not exclusive." Id.

Here, the six-year statute of limitations on the Government's collection action commenced on the date the subject entry was deemed liquidated by operation of law. See Am. Home Assurance I, 40 CIT at ___, 151 F. Supp. 3d at 1343. To determine when the deemed liquidation occurred it is necessary to determine when the removal of suspension occurred and when Customs received notice of the removal. See Int'l Trading Co., 281 F.3d at 1275-76.

It is undisputed that <u>Huaiyang Hongda</u> removed the suspension of liquidation when it became final on January 21, 2005. <u>See</u> Def.'s Br. 19; Pl.'s Br. 18. The parties disagree, however, on when Customs received notice of the removal. Fidelity argues that Customs received notice on January 21, 2005, i.e., "the date of notice of removal of suspension of liquidation was when there was a 'final court decision' with respect to [Hongda]." Def.'s Br. 18. Fidelity does not point to any evidence that demonstrates that Customs received notice of the removal of suspension on January 21, 2005. Rather, Fidelity maintains that, as a matter of law, Customs received § 1504(d) notice on the date <u>Huaiyang Hongda</u> became final.

Fidelity relies on <u>Fujitsu General</u>, but that reliance is misplaced. There, the U.S. Court of Appeals for the Federal Circuit held that the date on which Customs could be said to have received notice of the removal of suspension was the date on which Commerce published notice of the removal in the <u>Federal Register</u>, not the date on which the underlying decision dissolving the injunction against liquidation became final. <u>See</u> <u>Fujitsu Gen.</u>, 283 F.3d at 1382. Accordingly, Fidelity's argument fails.

Alternatively, Fidelity argues that Customs received notice when Customs published <u>Huaiyang Hongda</u> in the <u>Customs Bulletin</u> because "[t]he Customs Bulletin is made publicly available by Customs." Def.'s Br. 20 (citing 38 Cust. B. & Dec. 50). This argument, too, is without merit. In <u>Fujitsu General</u>, the Federal Circuit rejected the argument that Customs received notice of the final decision because it "was available in

a variety of commercially available print and electronic media." Fujitsu Gen., 283 F.3d at 1380. The court noted that 19 U.S.C. §1504(d) requires that the notice of removal come from Commerce, another agency, or a court with jurisdiction over the entry, and that "[g]eneral print or electronic media publications does not satisfy that requirement." Id. Subsequently, this Court observed that "[t]he [Customs] Bulletin is not an unambiguous and public form of notice, particularly because the Customs employees who are charged with liquidation are not: (1) responsible to read the Bulletin, (2) do not receive the Bulletin on a regular basis, and (3) receive notice only through [a particular] message board where the Bulletin is never posted." Travelers Indem., 32 CIT at 1063, 580 F. Supp. 2d at 1336. Here, Fidelity has not provided a basis to distinguish its case from Travelers Indemnity. Therefore, Fidelity's argument fails.

The Government argues that the only date Customs could have received sufficiently "unambiguous and public" notice for purposes of § 1504(d) was January 24, 2007, the date on which Commerce sent the Liquidation Instructions to Customs. See Pl.'s Br. 22. The court agrees. Commerce sent the Liquidation Instructions to Customs via electronic message, unambiguously notifying Customs of the dissolution of the injunction in Huaiyang Hongda. See Pl.'s Br., Ex. F (Commerce Message No. 7024202 to Customs (Jan. 24, 2007)) (referencing "Liquidation Instructions for Fresh Garlic – China Exp'd by [Hongda] (A-570-831-002) Ct. No. 03-00636 Dissolved"). The Liquidation Instructions were marked "public" and stated that there were no restrictions on the release of the information contained in the instructions. Id. ¶ 7.

Commerce informed Customs that Huaiyang Hongda was issued on November 22, 2004, and the injunction suspending the liquidation of certain entries of garlic dissolved as of January 21, 2005, when that decision had become final as the time to file an appeal with the Federal Circuit had expired. Id. ¶ 1. As a result, Commerce instructed Customs to "ASSESS ANTIDUMPING DUTIES ON THE MERCHANDISE ENTERED, OR WITHDRAWN FROM WAREHOUSE FOR CONSUMPTION DURING THE PERIOD 05/01/2002 THROUGH 10/31/2002 AT THE CASH DEPOSIT OR BONDING RATE REQUIRED AT THE TIME OF ENTRY." Id. ¶ 2. The message further stated: "THESE INSTRUCTIONS CONSTITUTE NOTICE OF THE LIFTING OF SUSPENSION OF LIQUIDATION OF ENTRIES OF SUBJECT MERCHANDISE DURING THE PERIOD 05/01/2002 THROUGH 10/31/2002." Id. ¶ 3. Accordingly, the only date on which Customs can be said to have received § 1504(d) notice of the removal of the suspension of liquidation was January 24, 2007, the date Customs received the Liquidation Instructions. See Travelers Indem., 32 CIT at 1061, 580 F. Supp. 2d at 1334 ("The Federal Circuit has held that specific liquidation instructions from Commerce via email or mailed notice, and publishing notice of a decision in the Federal Register are adequate forms of 'notice' under Section 1504(d)." (citations omitted)). The court now turns its attention to whether the Government commenced this action on a timely basis.

Here, Customs received the Liquidation Instructions on January 24, 2007 and liquidated the subject entry on September 21, 2007, approximately nine months after Commerce received those instructions. Because Customs failed to liquidate the subject

entry within the statutory six-month period under § 1504(d), the subject entry was deemed

liquidated on July 24, 2007. Therefore, the Government had six years from July 24, 2007

to bring a collection action. While the Government commenced this action on July 23,

2013, although one day prior to the expiration of the six-year statute of limitations,

it nevertheless did so within the period. Therefore, this action is timely.

### B. Validity of the Bond

A customs bond is a contract entered into by (1) a principal, usually an importer or

a customs broker, (2) a surety, who agrees to guarantee payment of any liability arising

from principal's failure to comply with its obligations, and (3) Customs. See Sarah M.

Nappi, Customs Bonds and Liquidated Damages, in U.S. Customs: A Practitioner's Guide

to Principles, Processes, and Procedures 201 (J. Brew et al. eds., 2016). A customs bond

is designed to protect the import revenue of the United States and to ensure compliance

with the laws enforced by Customs. Id.; see also 19 C.F.R. § 113 (2002); Def.'s Br., Ex. 2

(subject bond) ("In order to secure payment of any duty, tax, or charge and compliance

with law or regulation as a result of activity covered by any condition referenced below,

we, the below named principal(s) and surety(ies), bind ourselves to the United States in

the amount or amounts, as set forth below.").

Generally, an importer, or a customs broker on behalf of an importer, prepares and

files a bond with Customs, along with other required entry paperwork, in order to secure

release of the imported merchandise. See 19 C.F.R. § 142.3. An importer must use

"reasonable care" in preparing and filing the documentation and information required in an entry transaction. See 19 U.S.C. § 1484(a)(1) (requiring importers of record and their agents to use "reasonable care" in making an entry). Additionally, the customs laws provide that "[t]he documentation or information required under [§ 1484(a)(1)] with respect to any imported merchandise shall be filed or transmitted in such manner and within such time periods as the Secretary shall by regulation prescribe." 19 U.S.C. § 1484(a)(2)(A).

Reasonable care imposes an affirmative obligation on importers and their agents to confirm that the information transmitted to Customs is complete and accurate. See United States v. Golden Ship Trading Co., 25 CIT 40, 48 (2001) (holding that customs broker's failure to attempt to verify entry document information showed that she did not act with reasonable care); United States v. Rockwell Automation Inc., 30 CIT 1552, 1555, 462 F. Supp. 2d 1243, 1247-48 (2006) ("To encourage the accurate completion of the entry documents upon which Customs must rely to assess duties and administer other customs laws, the [Tariff Act of 1930] imposes a duty on importers to present true and correct information at entry." (internal quotation marks and citations omitted)).

For entry transactions where a customs bond is required, Customs' regulations prescribe the form and the content of the bond. See 19 C.F.R. §§ 113.11, -.21, -.62. For example, the party making the entry must submit the bond using Customs Form 301. Id. § 113.11. The bond must state the names and addresses of the principal and the sureties, any trade names and unincorporated divisions of a corporate principal that

are authorized to use the bond in their own name, the amount of the bond, and the date of execution. See id. § 113.21(a)(1), (2), (b) & (c).

These regulations also prescribe the requirements necessary to make changes to a bond. See 19 C.F.R. § 113.23. The regulations distinguish between changes that go to the substance of the bond and those that do not. "Modifications or interlineations" are changes that "go to the substance of the bond, or are basic revisions of the bond," 19 C.F.R. § 113.23(a)(1), while "alterations or erasures consist of minor changes, such as the correction of typographical errors, or change of address," i.e., changes that "do not go to the substance, or result in basic revision of the bond." 19 C.F.R. § 113.23(a)(2). Parties to a bond may be required to indicate their consent to a change or issue a new bond, depending on whether the change to the bond is substantive or non-substantive and whether it is made (1) before the bond is signed, (2) after it is signed, but before it is approved by Customs, or (3) after it is approved by Customs.[3]

Before a bond is signed, the parties may make either substantive or non-substantive changes to the bond, i.e., erasures, alterations, modifications,

---

[3] The customs bond must be filed with and approved by the director of the port where the subject merchandise is to enter prior to entry of the merchandise. See 19 C.F.R. § 113.11. "The port director will determine whether the bond is in proper form and provides adequate security for the transaction(s)." Id. "Customs' approval [of the bond] functions as an acceptance necessary to formation of the [bond] contract . . . ." Hartford Fire Ins. Co. v. United States, 36 CIT ___, ___, 857 F. Supp. 2d 1356, 1362 (2012). "Without Customs' approval of the bond, merchandise does not enter the United States, no duty is assessed, and no obligation exists for the surety to assume upon default." Id.

or interlineations. However, regardless of whether a substantive or non-substantive change is made, "a statement by an agent of the surety company or by the personal sureties to that effect must be placed upon the bond." 19 C.F.R. § 113.23(b).

After signature but before Customs' approval, substantive changes to the bond are prohibited, i.e., no modifications or interlineations shall be made on the bond, except in certain circumstances that are not applicable here. 19 C.F.R. § 113.23(c). If a non-substantive change is made, i.e., an erasure or alteration, "the consent of all the parties shall be written on the bond." Id. However, if a substantive change is desired, "a new bond will be executed." Id.

Once a bond is approved by Customs, no changes, whether substantive or non-substantive, may be made to the bond, except in cases where a change is expressly authorized by regulation or by the Commissioner of Customs: "[T]he port director shall not permit a change as defined in [19 C.F.R. § 113.23(a)] . . . after the bond has been approved by Customs. When changes are desired, a new bond is required, which, when approved, shall supersede the existing bond." 19 C.F.R. § 113.23(d).

Principles of suretyship law as explained in the Restatement (Third) of Suretyship and Guaranty (1996) ("Restatement") guide the court in determining parties' obligations under customs bonds. See Hartford Fire Ins. Co., 36 CIT at ___, 857 F. Supp. 2d at 1361 n.4 (citing United States v. Great Am. Ins. Co. of N.Y., 35 CIT ___, 791 F. Supp. 2d 1337, 1359-60 (2011)); see also Wash. Int'l Ins. Co. v. United States, 25 CIT 207, 224, 138 F.

Supp. 2d 1314, 1330 (2001). Regarding changes to a bond, the Restatement provides

that the modification of an underlying obligation may discharge the surety from any

unperformed duties if the change "imposes risks on the [surety] fundamentally different

from those imposed pursuant to the transaction prior to modification . . . ." Restatement

§ 41(b)(i). The Restatement also provides that it is no defense to a surety's obligation

where the form of the bond fails to comply with legally mandated formalities. Id. § 72

("When the law requiring a legally mandated bond also requires either that . . . the

secondary obligation be in a particular form; or . . . a particular procedure be followed in

connection with the furnishing of the bond the fact that such requirements were not fulfilled

is not a defense to the secondary obligation."). If the parties to a bond fail to comply with

legally mandated formalities, the obligee (here, Customs) "is free to reject the bond.

If, however, the obligee accepts the bond, the [surety] cannot avail itself of the defects in

form or procedure as a defense." Id. § 72 cmt. a.

China Leader's customs broker, Mid-America, transmitted information regarding

the subject bond to Fidelity's agent, IB&M, after bond signature. See Def.'s Statement

¶ 2. Fidelity argues that sometime after IB&M received the information, handwritten

changes were made to that bond.[4] Id. ¶ 4. From the face of the subject bond, it is clear

---

[4] Fidelity asserts that it is "unknown" who made the changes. Def.'s Br. 7. The Government responds that the subject bond and other accompanying entry documentation attached to the Diffley Declaration constitute the entry paperwork as submitted by Mid-America on behalf of China Leader on or about May 2002. See Pl.'s

(footnote continued)

that a change was made to the entry number. Specifically, the typewritten number 267-4230877-3 was crossed out, and next to it on the same line, the number 267-4221127-4 was written in by hand. In addition to the crossed-out entry number, Fidelity identifies two other hand-written insertions to the bond form that it alleges were not transmitted to IB&M previously, namely "a port code of '4601' was inserted into the box marked '[t]ransaction district & port code,' indicating the Port of New York/Newark . . . and [the] box . . . for 'CVD/AD' was checked." Id. ¶ 4. Fidelity's main argument is that these changes invalidated the subject bond and rendered Fidelity's obligations under that bond unenforceable. See Def.'s Br. 12. Fidelity also argues that under the applicable regulations Customs had a duty to reject the subject bond. See Def.'s Reply 6.

To the extent that Fidelity contends that the handwritten changes were made by Customs and occurred after Customs accepted and approved the submission of the subject bond, Fidelity offers no evidence in support of that claim. See Def.'s Reply 6-7. Fidelity attempts to flip the burden of producing evidence on its head in challenging the Diffley Declaration as failing to "prove that the modifications were not made after the approval of the bond by Customs." Id. at 7. By arguing that Customs was responsible for allegedly improper handwritten changes to the subject bond after it was accepted by

---

Br. 12. In any event, Fidelity's position appears to be that irrespective of who made the changes, or when they were made, Fidelity's obligations under the subject bond were rendered unenforceable by those changes. Def.'s Br. 14-15.

Customs in violation of 19 C.F.R. § 113.23(d), Fidelity must overcome the presumption that "public officers perform their duties correctly, fairly, in good faith, and in accordance with law and governing regulations." Parsons v. United States, 670 F.2d 164, 166 (Ct. Cl. 1982). "This presumption stands unless there is irrefragable proof to the contrary." Alaska Airlines, Inc. v. Johnson, 8 F.3d 791, 795 (Fed. Cir. 1993) (internal quotation marks omitted). As Fidelity has provided no evidence demonstrating (or even suggesting) that Customs made the changes at issue, the argument that the subject bond was improperly changed after approval by Customs under § 113.23(d) must fail.

As the importer of record, China Leader had an obligation to use reasonable care both in preparing and submitting the subject bond and complying with the applicable regulations, including the requirements of 19 C.F.R. § 113.23. See 19 U.S.C. § 1484(a). It appears this was not done. Whether the failure to comply with § 113.23 was due to a failure to communicate between IB&M and Mid-America, or between Fidelity and IB&M, or some other reason, is unclear. What is clear, however, is that Fidelity did not provide a surety statement pursuant to § 113.23(b) regarding any changes, nor did the parties indicate their consent to the desired changes, pursuant to § 113.23(c), or issue a new bond reflecting desired changes. See 19 C.F.R. § 113.23(c), (d).

Rather than take responsibility for its part in these failures, Fidelity contends that "the 'plain and unambiguous' meaning of [the terms of] 19 C.F.R. § 113.23 subsection (b) and (c) require[d] Customs to reject as invalid bonds that fail to comply with [§ 113.23]."

Def.'s Reply 5 (citing <u>Dodd v. United States</u>, 545 U.S. 353, 359 (2005) and <u>Lamie v. U.S. Trustee</u>, 540 U.S. 526, 534 (2004)). The court does not agree. Neither the terms of § 113.23(b) nor (c) contain any language requiring Customs to reject a bond for non-compliance with those provisions.[5] To the contrary, the regulations expressly leave it to Customs to determine "whether the bond is in proper form and provides adequate security for the transaction(s)." 19 C.F.R. § 113.11. Here, Customs approved the bond, despite the lack of compliance with § 113.23's requirements. Consequently, Fidelity cannot now "avail itself of the defect[] in form . . . as a defense" to enforcement of its obligation under the bond.[6] <u>See</u> Restatement § 72 & cmt. a (the obligee "is free to reject

---

[5] The <u>Dodd</u> and <u>Lamie</u> cases do not address the meaning of § 113.23(b) or (c); rather, Fidelity appears to have cited these cases for the proposition that where a statute's meaning is plain, the court's role is to enforce its terms.

[6] Fidelity's other arguments are not persuasive. Fidelity presents (1) a question with answer key from the April 2014 Customs Broker License exam and (2) HQ 209973, dated February 14, 1979, in support of its argument that Customs should have rejected the Subject Bond. Def.'s Br., Exs. 10, 11 & 13. Neither is a statement of policy or authority that compels a different result. The Customs Broker License exam is just that – a licensing exam, and HQ 209973 is Customs' response to a letter submitted to the District Director in Philadelphia regarding a "General Bond for Smelting and Refining Warehouses." <u>See</u> Def.'s Br., Ex. 10. HQ 209973 is an example of an instance where Customs returned a bond for correction or re-execution due to missing information (specifically, the surety's principal place of business and a corporate seal were missing) and certain interlineations. The interlineations were not accompanied by the statements or consent required by the version of § 113.23(b) and (c) in force at that time. <u>Id.</u> It is worth noting that HQ 209973 pre-dates the 1993 changes placing the duty of reasonable care on the importer. Furthermore, HQ 209973 does not indicate any intention to establish a per se rule removing the flexibility provided in the current regulations for Customs determine whether to approve a bond's form on a case by case basis. <u>Id.</u>

the bond. If, however, the obligee accepts the bond, the [surety] cannot avail itself of the defects in form or procedure as a defense.").

The Government argues that it is entitled to judgment as a matter of law because the bond, "on its face, is a valid and enforceable contract entered into by [Fidelity] and China Leader for the benefit of the Government in the amount of $231,000." Pl.'s Br. 9. The court agrees. As discussed above, the plain language of the regulations does not require that Customs reject a bond for non-compliance with § 113.23. Rather, the burden is on the parties submitting the bond for Customs' approval to exercise reasonable care in submitting the required entry paperwork, including a bond. The subject bond and entry documents submitted with the entry support the conclusion that the subject bond was intended to secure the entry. See Diffley Decl. ¶ 7 & Ex. A (providing documents from Customs' file for Entry No. 267-4221127-4 including "(1) Entry Summary, Customs Form 7501, (2) Customs Bond No. 0174477, (3) Entry/Immediate Delivery, Customs Form 3461, (4) Hongda Commercial Invoice no. HD02/LE19, (5) Hongda Packing List, (6) Phystosanitary Certificate, and (7) Bill of Lading No. TA0NYC2037023B"). In particular, it is evident from these documents that the entry was subject to antidumping duties and was entered through the port of New York/Newark by importer China Leader on or about May 1, 2002, after the posting of the subject bond. Additionally, based on searching its records for entry number 267-4230877-3—the crossed-out number on the subject bond—Customs determined that "Entry No. 267-4230877-3 does not correspond

to <u>any</u> entry brought into the United States by <u>any</u> importer." Pl.'s Br. 16 (citing Diffley

Decl. ¶ 7 & Ex. B). Here, it is clear from the totality of the circumstances that any defect

in the form of the subject bond did not prevent Customs from identifying the entry intended

to be covered. Because there is no genuine issue of material fact in dispute as to the

validity of the subject bond, the court determines that the Government is entitled to

summary judgment.

## C. Calculation of Interest

### (1) Section 580 Pre-Judgment Interest

The Government requests an award of statutory pre-judgment interest under

19 U.S.C. § 580. Section 580 provides that, in suits brought by the Government on a bond

for the recovery of duties, "interest shall be allowed, at a rate of 6 per centum a year,

from the time when said bond[] became due." 19 U.S.C. § 580. Fidelity disputes the

Government's entitlement to § 580 interest arguing, among other things, that the statute

applies to only regular duties and not antidumping duties.

The U.S. Court of Appeals for the Federal Circuit resolved the issue of whether the

Government may recover § 580 interest on dumping duties in <u>United States v. Am. Home</u>

<u>Assurance Co.</u>, 789 F.3d 1313, 1324-28 (2015) ("<u>Am. Home Assurance II</u>"). There,

the court held, "as a matter of law, that 19 U.S.C. § 580 provides for interest on bonds

securing both traditional customs duties and antidumping duties." <u>Id.</u> at 1324.

Since Defendant has not distinguished this action from <u>American Home Assurance II</u>,

the court holds that Fidelity is liable for statutory pre-judgment interest on the unpaid antidumping duties secured by the subject bond. In accordance with § 580, that interest will run at a rate of 6 percent per annum from the date the subject bond became due, which is the date of the Government's first formal demand for payment, see 19 C.F.R § 113.62(a)(1)(ii), to the date of payment.

### (2) Equitable Pre-Judgment Interest

The Government also seeks an award of equitable pre-judgment interest on the unpaid duties. Generally, pre-judgment interest "compensate[s] for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress." West Virginia v. United States, 479 U.S. 305, 310 n.2 (1987); see United States v. Goodman, 6 CIT 132, 140, 572 F. Supp. 1284, 1289 (1983) (Pre-judgment interest "is awarded to make the wronged party whole."). An award of pre-judgment interest is not limited by the face amount of the subject bond. See United States v. U.S. Fid. & Guar. Co., 236 U.S. 512, 530-31 (1915).

Here, there is a statute, 19 U.S.C. § 580, providing for pre-judgment interest in a Government enforcement action on a bond. Am. Home Assurance II, 789 F.3d at 1324-28. That would appear to resolve the matter because equity operates in the absence of a statute governing an award of pre-judgment interest, thereby resulting in the denial of the Government's request for equitable relief. However, the Federal Circuit has suggested

that an award under § 580 may "alter[] the landscape" in this type of action. Id. at 1330.

The Federal Circuit noted that the Court of International Trade, as the trial court, should

have "the opportunity to consider the effect of an award of § 580 interest and whether

dual sources of interest are proper," with "full compensation [for the injured party,

the Government,] being the court's overriding concern." Id. (internal quotation marks

omitted); see also United States v. Am. Home Assurance Co., 857 F.3d 1329, 1333-34

(Fed. Cir. 2017) ("Am. Home Assurance III").

   In determining whether to award equitable pre-judgment interest, the court is to

exercise its discretion, see United States v. Imperial Food Imps., 834 F.2d 1013, 1016

(Fed. Cir. 1987), guided "by traditional judge-made principles." City of Milwaukee v.

Cement Div., Nat'l Gypsum Co., 515 U.S. 189, 194 (1995). When bonds secure the

Government in the payment of antidumping duties, considerations that affect an award of

equitable pre-judgment interest include: "[1] the degree of personal wrongdoing on the

part of the defendant, [2] the availability of alternative investment opportunities to the

plaintiff, [3] whether the plaintiff delayed in bringing or prosecuting the action, and [4] other

fundamental considerations of fairness." United States v. Great Am. Ins. Co. of N.Y.,

738 F.3d 1320, 1326 (Fed. Cir. 2013) (quoting Osterneck v. Ernst & Whitney, 489 U.S.

169, 175-76 (1989)) (internal quotation marks omitted). Since the court has awarded the

Government statutory pre-judgment interest under § 580, it must also "consider the effect"

of that award and "whether dual sources of interest are proper." Am. Home Assurance II,

789 F.3d at 1338 (internal quotation marks and citations omitted); see also Am. Home Assurance III, 857 F.3d at 1334.

Fidelity contends that equitable considerations do not favor an award of equitable pre-judgment interest because Fidelity promptly "asserted colorable defenses in good faith at all relevant times during proceedings before Customs and this Court." Def.'s Br. 27. Fidelity attributes the duration of this dispute to the Government's "inaction and delay" over the years. Id. at 29. Specifically, Commerce issued the Liquidation Instructions more than two years after the decision in Huaiyang Hongda; liquidated the subject entry more than six months after the receiving notice that the suspension of liquidation was lifted; and issued a decision one year after Fidelity filed its 2008 protest, acknowledging that liquidation had occurred by operation of law. As of the time of briefing in this case, Fidelity had not received a decision from Customs on its 2010 protest. Finally, Fidelity notes that the Government brought this action one day prior to the expiration of the statute of limitations. Id.

The court agrees with Fidelity that the balance of the equities do not favor awarding the Government equitable pre-judgment interest in addition to § 580 interest. See Am. Home Assurance III, 857 F.3d at 1334 (affirming denial of equitable pre judgment interest given analysis of equitable factors and availability of pre-judgment interest under § 580). As an initial matter, while the Government's actions and timing may not have been optimal, the court cannot say that the Government unreasonably delayed the filing or

prosecuting of this action. The Government's final demand for payment from Fidelity occurred just three months prior to the commencement of this action. Despite the laxity of the Government in bringing this action from Defendant's perspective, it was nonetheless timely commenced, albeit by only one day prior to the running of the applicable the statute of limitations under 28 U.S.C. § 2415. See United States v. Am. Home Assurance Co., 39 CIT ___, ___, 100 F. Supp. 3d 1364, 1372-73 (citations omitted).

The docket of this action reveals a lengthy and involved litigation over the course of four years with many filings and numerous requests for extensions of time by Plaintiff and Defendant alike, but does not reflect that the Government was the source of any unreasonable delay. The court also observes that Fidelity has never paid the outstanding duties, despite Customs' multiple requests. While those factors may favor an award of equitable interest, the Government's entitlement to statutory pre-judgment interest under § 580 outweighs those considerations. Customs' demands for payment occurred initially in April 2008 and for the second time in May 2013. Equitable pre-judgment interest, if applicable, would run at the rate provided in 28 U.S.C. § 2644 and in accordance with 26 U.S.C. § 6621. See id. (citations omitted). Starting with April 2008 and ending with the date of issuance of the judgment in this action, the range of the applicable monthly Federal short term funds rates under 26 U.S.C. § 6621 is 0.16% to 2.51%, with an average rate of 0.64%, and a median rate of 0.51%. The 6% rate under § 580 far exceeds the applicable rates at which the Government would receive equitable interest.

Section 580 interest more than fairly compensates the Government for the time value of the unpaid duties. To award equitable pre-judgment interest in these circumstances would overcompensate the Government. As to other considerations of fairness, there is no suggestion that Fidelity proffered any defense not in good faith. Accordingly, the Government's claim for equitable interest is denied

### (3) Post–Judgment Interest

Lastly, the Government seeks an award of post-judgment interest. 28 U.S.C. § 1961(a) provides that post-judgment "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court."

Section 1961 does not directly apply to judgments rendered by this Court. <u>See</u> 28 U.S.C. § 1961(c)(4). However, the award of post-judgment interest by the Court of International Trade is predicated on 28 U.S.C. § 1585 that states the Court "possess[es] all the powers in law and equity of, or as conferred by statute upon, a district court of the United States." <u>Great Am. Ins. Co.</u>, 738 F.3d at 1326 (extending power to award post-judgment interest under 28 U.S.C. § 1961 to Court of International Trade pursuant to 28 U.S.C. § 1585).

Post-judgment interest is not discretionary, but rather is available as a matter of right to prevailing parties. <u>United States v. Servitex, Inc.</u>, 3 CIT 67, 68 n.5, 535 F. Supp. 695, 696 n.5 (1982); <u>see also</u> <u>Great Am. Ins. Co.</u>, 738 F.3d at 1326. Under § 1961(a) post-judgment interest is calculated from the date of entry of the judgment. This is a civil

case—a suit on a bond for the collection of unpaid duties—that has resulted in a money

judgment against Fidelity. Accordingly, the Government is entitled to post-judgment

interest at the rate provided for in § 1961.

### III. Conclusion

For the foregoing reasons, the court denies Defendant's motion for summary

judgment and grants Plaintiff's cross-motion for summary judgment, except with respect

to its claim for equitable pre-judgment interest. Accordingly, Plaintiff is entitled to collect

$231,000 in unpaid antidumping duties, the face amount of the subject bond. In addition,

the court awards Plaintiff pre-judgment interest under 19 U.S.C. § 580 and post-judgment

interest in accordance with this opinion. Judgment shall be entered accordingly.


                                                         /s/ Leo M. Gordon
                                                    Judge Leo M. Gordon


Dated: October 5, 2017
            New York, New York